# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 30, 2023

Lyle W. Cayce
Clerk

No. 19-50354

---

Reagan National Advertising of Austin, Incorporated,

*Plaintiff—Appellant*,

Lamar Advantage Outdoor Company, L.P., doing business as The Lamar Companies,

*Intervenor Plaintiff—Appellant*,

*versus*

City of Austin,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-673

---

ON REMAND FROM
THE SUPREME COURT OF THE UNITED STATES

Before Elrod, Southwick, and Haynes, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

No. 19-50354

Two outdoor-advertising companies filed applications with the City of Austin to digitize existing, traditional billboards and to upgrade signs with less sophisticated digitization. The City rejected their applications because the signs would advertise a business, service, or activity that was not located on the site where the sign was installed. The companies sued, arguing that the City's Sign Code's distinction between on-premises and off-premises signs violated the First Amendment. The district court upheld the Sign Code. When the case first came to this court, we reversed, holding that the on-premises/off-premises distinction was content based and could not survive strict scrutiny. The U.S. Supreme Court, though, held that the City's Sign Code was facially content neutral and, absent an impermissible purpose, would be subject to intermediate scrutiny. The Court remanded.

We conclude, applying the Supreme Court's new guidance, that the Sign Code survives intermediate scrutiny. We AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

Austin, Texas, regulates outdoor signs in Chapter 25-10 of its City Code (the "Sign Code").[1] The Sign Code defined "off-premise sign" as "a sign advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site." AUSTIN, TEX., CITY CODE § 25-10-3(11) (2016). The Sign Code generally prohibited the construction of new off-premises signs, § 25–10–102(1), but allowed existing off-premises signs to remain as "non-conforming signs," § 25-10-3(10). Non-conforming, off-premises

---

[1] We consider the City's 2016 Sign Code, which was in effect during the period relevant to this dispute. In August 2017, the City amended its Sign Code. The amendments, though, do not affect this appeal. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1470 n.1 (2022).

signs, though, could not change the "method or technology used to convey [their] message." §§ 25-10-152(A)–(B). The Sign Code permitted on-premises signs to be "electronically controlled changeable-copy sign[s]." § 25–10–102(6).

In sum, off-premises signs could not be upgraded.

The plaintiffs-appellants here are Reagan National Advertising of Austin and Lamar Advantage Outdoor Company. Both own billboards in Austin. In 2017, both submitted permit applications to digitize their existing off-premises signs. The City applied its Sign Code restrictions and denied the applications. Reagan subsequently sued the City in state court, alleging that the Sign Code's prohibition violated the First Amendment. The City removed the case to federal court; Lamar intervened as a plaintiff. After a bench trial, the district court entered judgment in favor of the City. *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 377 F. Supp. 3d 670, 683 (W.D. Tex. 2019). The court determined that the relevant Sign Code provisions were content neutral under *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). *Id.* at 678–81. The court applied the "intermediate scrutiny standard for commercial speech restrictions" and held that the Sign Code was constitutional. *Id.* at 682–83.

We reversed, holding that Austin's on-premises/off-premises distinction was content based. *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696, 707 (5th Cir. 2020). We then held that the Sign Code failed strict scrutiny, as most everything does. *Id.* at 710.

The Supreme Court reversed. *City of Austin v. Reagan Nat'l Advert. of Austin*, LLC, 142 S. Ct. 1464 (2022). We will explain the ruling in detail later. Here, we summarize by stating that the Court held the Sign Code was akin to an "ordinary time, place, or manner restriction[]." *Id.* at 1473. The Court remanded for further consideration of these issues, with intermediate

scrutiny as the standard unless an improper purpose for the relevant features of the Sign Code is identified. *Id.* at 1476.

## DISCUSSION

We address two dispositive issues. First, we determine whether the plaintiffs have waived their arguments challenging the Sign Code. We find no waiver and thus also address whether the Sign Code comports with the First Amendment. It does.

### I.     *Waiver of the plaintiffs' challenge*

The City contends the plaintiffs have waived any argument that the Sign Code does not survive intermediate scrutiny because that argument was not made in the alternative when this case was appealed here from district court. Further, the City asserts that the plaintiffs challenged only the Sign Code's on-premises/off-premises distinction and have therefore waived any arguments directed at the City's narrower ban on digitizing existing off-premises signs.

We address Austin's second contention first. At the district court, the plaintiffs challenged both the on-premises/off-premises distinction generally and the specific prohibition on digitizing off-premises signs. The plaintiffs requested that Chapter 25-10, *or any part thereof*, be declared unconstitutional. On appeal, the plaintiffs again argued that Chapter 25-10 was an unconstitutional content-based restriction. Chapter 25-10 includes the so-called "digitization ban" that the plaintiffs seek to invalidate. While the City may be correct that the plaintiffs' arguments on appeal focused on the on-premises/off-premises distinction, the City's bar on digitizing existing off-premises signs is part of that distinction. Thus, when the plaintiffs challenged Chapter 25-10 on appeal, they were also challenging the more targeted ban on digitizing off-premises signs. Further, on appeal, the plaintiffs sought to have all of Chapter 25-10 held to be unconstitutional.

Accordingly, the plaintiffs have not waived their argument that the City's ban on digitizing grandfathered off-premises signs violates the First Amendment.

On the other hand, in their appeal from district court, the plaintiffs made no effort to convince this court, as an alternative argument, that intermediate scrutiny was the proper test. In light of Supreme Court authority as it existed at that time, the plaintiffs asserted that strict scrutiny was "clearly" the appropriate standard. They also stated that we need not evaluate the Sign Code under intermediate scrutiny.

Ordinarily, "[a]n appellant abandons all issues not raised and argued in its initial brief on appeal." *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (emphasis omitted). There are exceptional circumstances, though. A remand from the Supreme Court after it altered the existing legal standard in some manner surely qualifies as one. "[T]he refusal to consider arguments not raised is a sound prudential practice, rather than a statutory or constitutional mandate, and there are times when prudence dictates the contrary." *Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J., concurring).

Important here, we have held that supplemental briefing may address new issues raised by an intervening clarification in the law. *See DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 326 n.2 (5th Cir. 1997). This allowance ensures that we do not "perpetuate incorrect law."[2] *Id.* In the present case, the Supreme Court reanalyzed the scope of its holding

---

[2] This concern is especially weighty here. The district court applied the *Central Hudson* commercial-speech test to the Sign Code. *Reagan Nat'l Advert.*, 377 F. Supp. 3d at 682 (citing *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). That was error. *See Reagan Nat'l Advert.*, 142 S. Ct. at 1471 n.3 (recognizing that *Central Hudson* does not apply, because the Sign Code applies to commercial and noncommercial messages alike).

in *Reed*, explaining the correct framework to evaluate whether a given law is content neutral. *Reagan Nat'l Advert.*, 142 S. Ct. at 1474–75. That clarification directly affects the appropriate level of scrutiny. Regardless of whether the Supreme Court revised or merely clarified the existing test for content-based restrictions, the new state of the law allows a party to address the current reality with appropriate arguments.

We add some suspenders to the belt we just described. A waived issue can be addressed when "it is a purely legal matter and failure to consider the issue will result in a miscarriage of justice." *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021) (quotation marks and citation omitted). We have also departed from the general rule when the issue "presents a pure legal question, and . . . no prejudice will accrue to the defendant[]." *Pegues v. Morehouse Par. Sch. Bd.*, 706 F.2d 735, 738 (5th Cir. 1983). Here, the level of scrutiny that applies to the Sign Code is a pure legal question. Further, Austin has argued throughout the case that the Sign Code should be subject to intermediate scrutiny; thus, it is not prejudiced by our application of that standard. Indeed, the district court applied intermediate scrutiny. *Reagan Nat'l Advert.*, 377 F. Supp. 3d at 682. Consideration of the plaintiffs' arguments that the Sign Code fails intermediate scrutiny is proper.

## II.    First Amendment

As we begin our examination of the merits, we elaborate on what the Supreme Court held before remanding the case. The Court held, "the City's off-premises distinction requires an examination of speech only in service of drawing neutral, location-based lines." *Reagan Nat'l Advert.,* 142 S. Ct. at 1471. The distinction "do[es] not single out any topic or subject matter for differential treatment . . . . Rather, the City's provisions distinguish based on location: A given sign is treated differently based solely on whether it is located on the same premises as the thing being discussed or not." *Id.* at

No. 19-50354

1472–73. The Court rejected the "view that any examination of speech or expression inherently triggers heightened First Amendment concern." *Id.* at 1474 (emphasis omitted).

The Court also clarified the scope of its holding in *Reed v. Town of Gilbert*. *Id.* The Court cautioned against "stretch[ing] *Reed*'s 'function or purpose' language too far." *Id.* *Reed* does not, the Court explained, stand for the proposition that "any classification that considers function or purpose is *always* content based." *Id.* (emphasis in original). Only "regulations that discriminate based on 'the topic discussed or the idea or message expressed' [] are content based." *Id.* (quoting *Reed*, 576 U.S. at 171). Because the City's Sign Code did not discriminate on those bases, the Court concluded that it is not facially content based. *Id.* at 1474–75.

Even if not content-based, to survive a First Amendment challenge, the ordinance must not have an improper purpose:

> If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction, for instance, that restriction may be content based. Moreover, to survive intermediate scrutiny, a restriction on speech or expression must be narrowly tailored to serve a significant governmental interest.

*Id.* at 1475–76 (quotation marks and citations omitted).

The plaintiffs do not assert that an "impermissible purpose or justification underpins" the City's facially content-neutral restriction. *See id.* at 1475. Thus, we apply intermediate scrutiny, meaning that the Sign Code's "restriction on speech or expression must be 'narrowly tailored to serve a significant governmental interest'" *Id.* at 1475–76 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The government's interests need be accomplished through the "least restrictive or least intrusive means." *Ward*, 491 U.S. at 798. "Rather, the requirement of narrow

tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799 (quotation marks and citation omitted).

Neither party contests the existence of significant government interests. The City asserts that the regulation of off-premises signs advances its interests in "traffic safety and esthetics."[3] The plaintiffs concede that the Supreme Court has recognized those interests as substantial governmental goals. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981). Thus, the only issue we must address is whether the Sign Code's ban on digitizing existing off-premises signs is "narrowly tailored to serve a significant government interest." *See Reagan Nat'l Advert.*, 142 S. Ct. at 1475–76.

Before addressing that issue, we note that the Supreme Court has "repeatedly reviewed and never previously questioned" on-premises/off-premises distinctions. *Id.* at 1475. Such distinctions are part of an "unbroken tradition" that traces to the 1800s. *Id.* "Each medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Metromedia*, 453 U.S. at 501 n.8 (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975)). In the context of sign regulations, the Court has generally accorded municipalities significant leeway. *See, e.g., Suffolk Outdoor Advert. Co. v. Hulse*, 439 U.S. 808 (1978); *Metromedia*, 453 U.S. 490.

The City identifies two interests as supporting the Sign Code: traffic safety and aesthetics. In *Metromedia*, the Court upheld San Diego's ban on

---

[3] Quotes in this opinion will contain two different spellings of the same word: aesthetics and esthetics. We will not force consistency. We do strive for consistency when we are not quoting and chose "aesthetics."

off-premises commercial billboards. It found that "billboards are traffic hazards" and "can be perceived as an 'esthetic harm'"; a ban on off-premises commercial billboards would advance San Diego's interests in promoting traffic safety and aesthetics. *Metromedia*, 453 U.S. at 509–10. The Court rejected arguments that the ban was underinclusive in permitting onsite advertising: San Diego could reasonably determine that "offsite advertising, with [its] periodically changing content, presents a more acute problem than does onsite advertising." *Id.* at 511. Further, a commercial enterprise "has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere." *Id.* at 512.

The City's Sign Code is supported by the same logic. The City is entitled to use its legislative judgment to conclude that off-premises advertising undermines its interests in safety and aesthetics more than on-premises advertising does.

The plaintiffs argue that *Metromedia* is of limited relevance because they are not challenging the City's ban on new off-premises signs but only the ban on digitizing existing off-premises signs. They assert: "the City has not shown that its interests in safety and aesthetics apply differently when considering the digitization of the limited number of off-premises signs that the City has grandfathered under its sign code, as compared to the digitization of the unlimited number of on-premises signs that the City allows." The problem with that argument is that intermediate scrutiny does not require perfect tailoring. *See Ward*, 491 U.S. at 798–99. Nor does *Metromedia*:

> Appellants question whether the distinction between onsite and offsite advertising on the same property is justifiable in terms of either esthetics or traffic safety. The ordinance

No. 19-50354

permits the occupant of property to use billboards located on that property to advertise goods and services offered at that location; identical billboards, equally distracting and unattractive, that advertise goods or services available elsewhere are prohibited even if permitting the latter would not multiply the number of billboards. Despite the apparent incongruity, this argument has been rejected, at least implicitly, in all of the cases sustaining the distinction between offsite and onsite commercial advertising. We agree with those cases . . .

*Metromedia*, 453 U.S. at 511.

The Court continued: "In the first place, whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising." *Id.*

The plaintiffs do not contest that the prohibition on off-premises digital signs is related to public safety and aesthetics. Those interests continue to be served even if the Sign Code is underinclusive by permitting on-premises digital signs. Further, the City "may believe that offsite advertising, with i[t]s periodically changing content, presents a more acute problem than does onsite advertising." *Id.* This logic applies equally to digital signs: the City may believe that off-premises digital signs generally have more content turnover than on-premises digital signs and therefore pose a larger threat to public safety.[4]

---

[4] We mention that the City and amici marshaled pertinent evidence when this case was at the Supreme Court. *See, e.g.*, Reply Brief for Petitioner at 20, *City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S. Ct. 1464 (2022) (No. 20-1029) ("[S]tudies do support that on-premises digital signs are less distracting than their off-premises counterparts." (emphasis omitted) (citing Jerry Wachtel, *Compendium of Recent Research Studies on*

No. 19-50354

*Metromedia* also gave substantial weight to the legislative judgment that on-premises speech is more valuable than off-premises speech:

> San Diego has obviously chosen to value one kind of commercial speech — onsite advertising — more than another kind of commercial speech — offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics.

*Id.* at 512.

The Court also found justification for San Diego's distinctions in that city's belief that a business would be more interested in advertising its place of business onsite than it would be in advertising its activities on a billboard located elsewhere. *Id.* Indeed, not to allow a business to notify and attract customers by signage at the business's physical location would be a significant barrier to operations. There is quite clearly a heightened need for on-location signs. Likewise, Austin could reasonably conclude that commercial and noncommercial enterprises have a stronger interest in identifying their places of operation and therefore are entitled to greater leeway than those engaged in off-premises advertising.

The plaintiffs argue that such leeway is unlimited because "the sign code is entirely devoid of any limits on on-premises digital signs." That is factually incorrect. Austin's Sign Code restricts on-premises sign owners to one sign per building or curb cut and prohibits glare visible from the roadway. Austin City Code § 25-10-101(B)(1), (C)(1), (G)(1); § 25-10-192(B)(1). Off-

---

*Distraction from Commercial Electronic Variable Message Signs (CEVMS)* 10 (2020))); *see also Reagan Nat'l Advert.,* 142 S. Ct. at 1479 (Breyer, J., concurring) (summarizing studies showing that "on-premises [digital] signs are less likely to cause accidents" and are typically smaller in size than off-premises digital signs).

No. 19-50354

premises signs are regulated more strictly. Under *Metromedia*, the distinction is permissible.

The City has also justified its digitization prohibition by arguing that it will cause off-premises billboards to be removed in time. At oral argument, the City asserted that "the whole idea behind [the prohibition] is that eventually [off-premises signs] peter out and go away." In that same vein, at the Supreme Court the City expressed that "part of the reason for having a grandfather clause [] that limits the modifications you can make to a sign is an interest in gradually phasing out those off-premises signs." Transcript of Oral Argument at 52, *City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S. Ct. 1464 (2022) (No. 20-1029). The City's argument at the Supreme Court may well flow from the sense that digital signs produce more income than traditional signs; limiting digitization, then, may eventually lead to the removal of traditional off-premises signs altogether.

This understanding means that, instead of banning off-premises signs outright, the City has chosen a course of encouraging elimination more gradually, indeed, less economically disruptively for the plaintiffs and others in the same business.[5]

This raises the question of whether a total, immediate ban on off-premises signs would be constitutional. There is some support for a total ban

---

[5] Allowing nonconforming uses to continue at least for a time is a moderate and often upheld path to accomplish zoning goals. 2 PATRICIA E. SALKIN, AM. LAW ZONING § 12:1 (5th ed. 2022). Moreover, the rule that nonconforming uses may not increase their degree of nonconformity is a pillar of zoning laws. One treatise states that "continu[ing] a nonconforming use does not include a right to expand or enlarge it." *Id.* at § 12:19. Another summarizes that "[w]ith the objective of eventually terminating nonconformities zoning codes generally prohibit enlargement or extension or changes in the nature of nonconforming uses." 4 RATHKOPF'S THE LAW OF ZONING & PLANNING § 73:2 (4th ed. 2022).

No. 19-50354

in *Metromedia*'s logic. There, San Diego banned off-premises commercial signs and all noncommercial signs, subject to some content-based exceptions. *Metromedia*, 453 U.S. at 494–96, 512–13.

As explained earlier, the Court upheld the ban on off-premises commercial signs. *Id.* at 512. The Court also, however, struck down the ban on all noncommercial advertising. *Id.* at 512–17. It did so for two reasons, neither of which cast doubt on a total off-premises ban foreshadowed by Austin's regulations.[6]

First, the Court found that San Diego's regulations inverted the usual judgment that noncommercial speech is accorded more protection than commercial speech. *Id.* at 513. Austin has not offended that judgment. The City's Sign Code treats commercial and noncommercial messages alike. That parity is all *Metromedia* seems to require.

Second, the Court explained that "[a]lthough the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests." *Id.* at 514. By "communicative interests," the Court was referencing the fact that San Diego's regulations discriminated on the basis of content, allowing some noncommercial messages but not others. *Id.* at 494, 514–16. The Court was concerned about government control of "the appropriate subjects for public discourse." *Id.* at 515.

---

[6] These two reasons, which supported the Court's judgment with respect to San Diego's noncommercial sign regulations, garnered only a plurality. *Metromedia*, 453 U.S. at 541 (Stevens, J., joining Parts I through IV of the plurality opinion and dissenting in part). Nevertheless, we consider their persuasiveness here.

No. 19-50354

That concern is absent here.  As the Supreme Court determined, Austin's Sign Code does not allow content discrimination. *Reagan Nat'l Advert.,* 142 S. Ct. at 1472–73.  Whereas the *Metromedia* Court rejected that San Diego's ordinance was a "time, place, and manner" restriction, *Metromedia*, 453 U.S. at 515, here the Court has held that Austin's Sign Code is exactly that.  *Reagan Nat'l Advert.,* 142 S. Ct. at 1473.

As a result, *Metromedia*'s logic fits poorly here.  Indeed, the upshot of the Court's logic was this: "Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones." *Metromedia*, 453 U.S. at 515.  Austin, again, does not offend this requirement: unlike San Diego's ordinance, Austin's Sign Code is content neutral and therefore does not allow certain noncommercial messages but not others.  In this way, Austin's Code does not hand the "government the choice of permissible subjects for public debate." *See id.* (quotation marks and citation omitted).

The City also argues, though it provides no evidence we can find, that off-premises signs are larger than those on-premises, and thus the former cause more visual clutter.  More generally, Austin provided little empirical evidence supporting its restrictions.  Nonetheless, intermediate scrutiny has "never required" a municipality to "demonstrate, not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully" achieve the desired end. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439 (2002).  "[M]unicipalities must be given a reasonable opportunity to experiment with solutions to address the secondary effects of protected speech." *Id.* (quotation marks and citations omitted).  As a result, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and

No. 19-50354

plausibility of the justification raised." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000).

In the context of sign codes, which are part of a "regulatory tradition" dating back well over a century, the Court has not required a great quantum of empirical support. *See Reagan Nat'l Advert.*, 142 S. Ct. at 1469. The Court upheld San Diego's off-premises commercial sign ban based on intermediate scrutiny, relying on the "accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." *Metromedia*, 453 U.S. at 509. We conclude there is enough evidence and common sense here supporting Austin's Sign Code distinction.

The Seventh Circuit recently reached a similar conclusion. *See Adams Outdoor Advert. Ltd. P'ship v. City of Madison, Wisconsin*, 56 F.4th 1111 (7th Cir. 2023). There, the court considered the City of Madison's sign code, which prohibits the digitization of off-premises commercial signs but allows on-premises digital signs. *Id.* at 1114–15. The court held that the distinction survives intermediate scrutiny. *Id.* at 1120. Further, the court responded to the plaintiff's argument "that the City must provide empirical evidence linking digital billboards to aesthetic or safety-related harms. Not so . . . . [T]he connection between billboards and traffic safety is too obvious to require empirical proof." *Id.*

It is true that Austin's Sign Code is broader than Madison's. Leaving aside grandfathered signs, Austin's Code bars off-premises commercial *and* noncommercial signs. *Reagan Nat'l Advert.*, 142 S. Ct. at 1471 n.3. As we explained earlier, however, Austin's Sign Code treats commercial and noncommercial messages alike and is content neutral — thus passing muster under *Metromedia*. The difference between Austin's and Madison's sign

codes, then, is not legally relevant. We are persuaded by *Adams*'s reasoning with respect to "obvious," common-sense judgments.

Finally, we discuss the plaintiffs' reliance on *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). Cincinnati had banned the distribution of commercial handbills through newsracks on public property, citing an interest in safety and aesthetics. *Id.* at 419. Cincinnati did not, though, ban newspaper distribution through newsracks. *Id.* The Court held that the distinction between commercial handbills and newspapers failed intermediate scrutiny because the newsracks containing commercial handbills "are no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks." *Id.* at 425. Newspapers and commercial handbills were "equally at fault" for the harms Cincinnati sought to prevent, and therefore the city "ha[d] not established the 'fit' between its goals and its chosen means." *Id.* at 426, 428. The plaintiffs see an analogy, because Austin's "prohibition on digitizing off-premises but not on-premises signs draws distinctions between two forms of speech that are 'equally at fault' for the harms the City seeks to remedy."

The effort to compare all billboards to all newsracks fails. The Supreme Court could discern no meaningful difference between newspapers and commercial handbills. Both were sold on identical newsracks and were equally responsible for harms inflicted to public safety and aesthetics. *Discovery Network*, 507 U.S. at 425–26. In the context of sign regulations, by contrast, the Court has discerned a meaningful difference between on-premises and off-premises signs. *See Metromedia*, 453 U.S. at 511. Indeed, the *Discovery Network* court explicitly disclaimed any similarity in its issues to those in *Metromedia*, which involved a distinction that was well-supported by differences between on-premises and off-premises signs. *Discovery Network*, 507 U.S. at 425 n.20. Moreover, context is always critical. While the *Discovery Network* analysis may not tolerate underinclusivity with respect

No. 19-50354

to newsrack regulations, *Metromedia* — which deals directly with the subject matter, sign regulations, at issue here — does not demand airtight tailoring. Thus, *Discovery Network* does not alter our conclusion.

Municipalities have traditionally been given wide discretion in the domain of sign regulations. Austin is entitled to that latitude. AFFIRMED.

No. 19-50354

Jennifer Walker Elrod, *Circuit Judge*, concurring in part[7] and dissenting in part:

The City of Austin's Sign Code prohibits digitization of certain grandfathered off-premises signs yet allows unlimited digitization of on-premises signs. I dissent from the majority opinion's conclusion that this selective prohibition survives intermediate scrutiny. Under that standard, the City bears the burden to show that the ban is narrowly tailored to further an important governmental interest. *See City of Cincinnati v. Discovery Network*, 507 U.S. 410, 416 (1993). And in considering the ban, the majority opinion gives substantial deference to the City's "legislative judgment." *Ante* at 11. But such deference is inappropriate when applying intermediate scrutiny. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 514 (1981). As such, in my view, the majority opinion's approach is really just rational-basis review masquerading as intermediate scrutiny. I would hold that the City's ban violates the First Amendment because, under a proper application of intermediate scrutiny, the City fails to carry its burden to establish that the provisions were narrowly tailored to further its stated interests.

Here, the City contends that the ban is necessary to further important safety and aesthetic interests. In this regard, the issues presented here closely resemble those presented in *City of Cincinnati v. Discovery Network*. There, the City of Cincinnati banned the distribution of commercial handbills through freestanding newsracks located on public property, but allowed the distribution of newspapers on public sidewalks. *Id.* at 419. The Supreme

---

[7] I agree with the majority opinion that consideration of the intermediate scrutiny argument is proper. The Supreme Court remanded to this panel, explicitly stating that the Court's ruling did not "end the First Amendment inquiry," that "[t]he parties dispute whether the City can satisfy [intermediate scrutiny]," and that "the Court leaves [that inquiry] for remand." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022).

No. 19-50354

Court held that the distinction between commercial handbills and newspapers failed intermediate scrutiny because handbills "are no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks." *Id.* at 425. And because "the distinction Cincinnati has drawn had absolutely no bearing on the interests it has asserted," the Court held that the City failed to "established the 'fit' between its goals and its chosen means." *Id.* at 428.

Likewise, the provisions at issue here have no bearing on the interests the City of Austin asserts. The City offers no studies, surveys, or statistics to suggest that digitizing the limited number of grandfathered off-premises signs would be either more dangerous or less attractive than digitizing on-premises signs. Neither does common sense support the distinction because off-premises digital signs employ the exact same technology as their on-premises counterparts. If anything, just like the newsracks in *Discovery Network*, on-premises signs are "arguably the bigger culprit because of their superior number." *Id.* at 426. When put under the appropriate quantum of scrutiny, the City's justifications do not hold up.

But the majority opinion does not truly test the City's justifications. It admits that "little empirical evidence" supports the "restrictions" at issue here. *Ante* at 15. Even so, it declines to probe the issue further, citing *Metromedia, Inc. v. City of San Diego* for the proposition that the court ought to afford "substantial weight" to the City's "legislative judgment that on-premises speech is more valuable than off-premises speech." *Id.* at 11–12.

A more precise reading of *Metromedia* suggests something different. There, the Court considered the constitutionality of the City of San Diego's ordinance prohibiting outdoor advertising display signs. 453 U.S. at 493. True, the Court expressed caution in testing the City's judgment. *Id.* at 509 ("We likewise hesitate to disagree with the accumulated, common-sense judgements of local lawmakers."). But the Court expressly limited that

caution to purely *commercial* speech restrictions. In a later section discussing *non-commercial* speech restrictions, the Court explained that the latter are to be given significantly less deference. *Id.* at 514 ("Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of non-commercial speech to evaluate the strength of, or distinguish between, various communicative interests.").

Instead of acquiescing to unsubstantiated rationales, the Court counseled against "deferring to merely rational legislative judgments" and emphasized that it is the court's responsibility "to weigh the circumstances and to appraise the substantiality of the reasons advance[d] in support of the regulation." *Id.* at 519. And unlike the majority opinion here, neither did the Court attempt to come up with its own possible reasons for why the regulations "may" be justified. *Ante* at 11–12. Rather, the Court determined that the ordinance was "unconstitutional on its face" because the City failed to "explain how or why" its purported distinction related to non-commercial billboards would promote safe driving. *Metromedia*, 453 U.S. at 521. In short, the substantial deference applied by the majority opinion has no place in the intermediate-scrutiny analysis of non-commercial speech restrictions.

The majority opinion asserts that *Metromedia*'s commercial vs. non-commercial distinction "is not legally relevant" because the Sign Code is content neutral, *ante* at 16, but that invents a logical rule that does not exist in *Metromedia*. The Court in *Metromedia* clearly explained what motivated its deference, and what did not. It noted: "The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." 453 U.S. at 507 (quoting *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557 (1980)). Accordingly, the Constitution affords noncommercial speech "a greater degree of protection than commercial speech." *Id.* at 513. And because the first provision at issue there

only restricted commercial speech, the Court determined that a heightened deference to the legislature was proper. *See id.* at 509.

Second, the Court was clear that any absence of regulation on the communicative aspect of speech *did not* motivate its heightened deference to the city. The Court instructed that courts should conduct a "careful inquiry into the competing concerns," even if the ordinance at issue only impinges on the noncommunicative aspects of speech. *Id.* at 517. It observed that "[b]ecause regulation of the non-communicative aspects of a medium often impinges to some degree on the communicative aspects," "[a] court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation." *Id.* at 502. Thus, contrary to the majority opinion's assertions, *Metromedia* does not stand for the proposition that courts can defer to "common-sense" judgments of local lawmakers merely because the ordinance "treats commercial and noncommercial messages alike and is content neutral." *Ante* at 16; *see Nat'l Advert. Co. v. City of Orange*, 861 F.2d 246, 248 (9th Cir. 1988) ("Merely treating noncommercial and commercial speech equally is not constitutionally sufficient. The first amendment affords greater protection to noncommercial than to commercial expression.") (citing *Metromedia*, 453 U.S. at 506–07).

Finally, the City and the majority opinion point us to the Seventh Circuit's recent decision in *Adams Outdoor Advertising LP v. City of Madison, Wisconsin*, asserting that it lends support to the digitization ban. No. 20-1670, 2023 WL 33962, at *3 (7th Cir. Jan. 4, 2023). It does not. Unlike the ordinance in the present case, which apply to both commercial and non-commercial messages, the ordinance in *Adams* only applies to commercial messages. *Id.* This difference is crucial because, in the context of purely commercial speech restriction, we ought to give some deference to reasonable legislative judgment, and "the city may distinguish between the relative value

of different categories of commercial speech." *Metromedia*, 453 U.S. at 514. In contrast, in the area of non-commercial speech, we ought not "defer[] to merely rational legislative judgments." *Id.* at 519.

Here, the parties do not dispute that the provisions at issue apply to non-commercial speech. *Cf. Adams*, 2023 WL 33962, at *3 ("[T]he definition of 'advertising sign' in Madison's ordinance is limited to off-premises signs bearing commercial messages."). And this panel has likewise observed that "the regulation applies to any noncommercial message 'off-premises.'" *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696, 708 (5th Cir. 2020), *rev'd on other grounds*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464 (2022). Thus, consistent with the Supreme Court's reasoning in *Metromedia*, I would not defer to legislative judgments, rely on the City's scant empirical evidence, or construct possible reasons for why the distinction "may" be justified. *Ante* at 11–12. After all, the applicable standard here is intermediate scrutiny, not rational basis.

Consequently, because the City has not carried its "burden to establish a 'reasonable fit' between its legitimate interests in safety and esthetics and its choice of a limited and selective prohibition," I would hold that the selective prohibition of off-premises signs digitization fails intermediate scrutiny. *Discovery Network*, 507 U.S. at 416. With great respect, I dissent from the majority opinion's conclusion that the Sign Code survives intermediate scrutiny and is consistent with the First Amendment.